and Allen. All right. Good morning. So we're splitting between the two defendants. So Mr. Allen will be first. Is that right? No. Mr. Wyche will be first. Okay. All right. So Mr. Irace, am I pronouncing that right? Yes, Your Honor. Okay. So you're up first or... Yes. Yeah. You're up first. All right. So you've reserved a minute for rebuttal. Correct. And so that gives you then five to start. Okay. You may proceed. Good morning, Justices of the panel and may it please the Court. My name is Carl Irace and I represent the appellant Keith Wyche. We are here because the sentencing proceeding wasn't fair. It resulted in a 40-year sentence that isn't fair to Mr. Wyche. The district court didn't have a fair opportunity for circumspect consideration of the factors that would benefit a sentencing analysis in a death and near-death case like the tragic one at hand. In doing so, the public was deprived of a fair proceeding too. Mr. Wyche respectfully asked this panel to remand it back to the sentencing proceeding or perhaps to reduce his sentence here. This case does involve a tragic and unfortunate death related to... What was unfair about the proceeding, the sentencing proceeding? Well, the sentencing proceeding didn't involve an analysis or any articulated analysis that relates to two things. There are two main points that I want to raise today and one is about the but-for causation and I think that does relate to the fairness of the case. The other aspect that is related not only to the but-for causation but directly to sentencing is the role of intent in sentencing. And the 5K2.1 analysis that does apply to departures, and I realize that this wasn't a departure sentence, this wasn't a variant sentence, this was a guideline sentence. But I think that the guidance in that statement in 5K2.1 is so powerful and so instructive that its absence here created a procedurally unreasonable... Its absence that the district court should have referred to a section of the guidelines that by definition didn't apply? No, I'm not saying anyone should have referred to something needed to refer to anything like that. I'm saying that that style of analysis analyzing the different types of death or methods of death or things as set forth in that section, I'm saying that style of analysis would have benefited. I'm not sure what you mean by that. What should the district court have done that it did not do? Contemplated the state of mind and planning and preparation, the number of fatalities at hand, the manner of death. You don't think the district court considered those things? No. This seems to have been a sentence that was based on the 3553A factor, the nature and circumstance of the offense, and the district court judge does speak about the scourge of this type of conduct and fentanyl deaths and fentanyl distribution. Right, but the district court is required to consider the 3553A factors, which the district court did. You seem to be suggesting the district court should have done more than that and looked at provisions of the guidelines to do a little more, even though you said that a section of the guidelines doesn't even apply to the case. What I'm suggesting is that the district court relied so heavily on that 3553A factor without the consideration for some of these other details, which I think is more circumspect analysis, would have resulted in a fairer sentence. But what is the record to suggest that the district court was oblivious to these things? It seems to me what you're saying is the district court didn't give enough weight to certain things, including intent or the nature of these kinds of crimes generally. This is not a premeditated murder. This is different. But what is there to suggest that the court was unaware of all the things that you are talking about now? That it's not contemplated. It's in there in that it's not in there. The record doesn't reflect that. So the district court has to articulate why it is that the arguments you're making now are not a basis to go below the guidelines. I'm saying the absence of it, the absence of contemplating this but-for-causation issue, the absence of contemplating this particular type of intent was unreasonable and created this really harsh and substantively unreasonable 40-year sentence. That's what I'm saying. I'm not sure. Why would you think the district court didn't consider the but-for-causation issue? That's something that was proven at trial, right? That's part of our deal. You're challenging whether there was sufficient evidence of that. But the district court at the time of sentencing presumably concluded that the jury's verdict covers the but-for-causation, right? Yes. And I think that the... Well, you're not challenging a Rule 29 motion, right? No. We are challenging that but-for-causation issue. We're challenging the reasonableness of sentence and some of the other things. Why I think it matters is that this sentence is so high and seems so disproportionate compared to other similarly situated instances and defendants, and that if it had had this other analysis, that if it's not in the record, there's no record that this kind of mystery about the causation, which I think the Barrage analysis favors my client, and I think that if that had been part of the analysis, and I think that if the intent had been part of the analysis, we wouldn't have wound up with a 40-year sentence. And that's what brings us here today. Well, I mean, the district court specifically referenced the fact that your client continued selling even after the sentence and even after he was aware that overdoses were happening from the product that he was selling, and also made note of the fact that he had prior conviction for narcotics trafficking. So why do you think the district court didn't consider intent? I mean, it seems to me the district court expressly concluded that your client decided to keep selling, notwithstanding the overdoses that he was aware of. Because I think that the sentence is related to this particular death rather than that conduct here. I think that the ongoing conduct, which is part of it and part of the 3553A factor, which was considered a sentence, is what I think was absent is this tragic death happened. It wasn't an intentional death. Well, it doesn't have to be an intentional death, right? I realize that. I realize that this statute is a bit unconventional in that it has this kind of strict liability on this one element. Well, presumably most drug dealers are not selling with the intent that it will kill the customer. They're selling with the intent that the powerfulness of the drug will get around and people will know. So if there's one overdose, it might be really good for business, because that seems to encourage users to think that this is a good product. And it seems like your client was aware of that, right? That's in the record. And I still think that the absence of a more circumspect analysis of the style of analysis, again, not an explicit analysis of the 5K2.1 factors. I just use that as a reference point because they're so well articulated in that section. I think that that type of analysis would have benefited all sides. And I think there are some lesser sentences that would have also satisfied the purposes of sentencing and been also no greater than necessary to respect for liability. It would have been fine to have a law and impose general deterrence and specific deterrence and sufficiently punish Mr. Weiss without a 40-year sentence. All right. Well, you reserved a minute for rebuttal. I did. I appreciate the opportunity to go a little over here. Thank you. Okay. Thank you. Ms. Van Ness, we'll now hear you for the staying breakdown. You also reserved a minute for rebuttal. Good morning. My client is serving a 30-year sentence for being an accomplice to a crime that he had nothing to do with. There are two elements to accomplice liability. There's a mens rea element and there's an actus rea element, and the record has no evidence to support either. Ms. Weibolt, the subject of Cap 4, testified, and the government agreed at trial, and I believe agrees on appeal, that the sale to her on October 27, 2017, was conducted entirely by the co-defendant. He was the one that sent out an e-mail blast that day saying, I'm around if anybody wants anything. She responded. Mr. Weiss set the meeting point. He met her alone. He gave her the drugs and pocketed the cash and left. But the jury found that they were working together, that they were conspiring. Well, I'm sorry. The jury convicted my client of Count 4 liability, and they also found that he was part of the conspiracy, but the conspiracy charge has nothing to do with the substantive sale count that I'm talking about now. Well, it has nothing to do with it? Nothing to do with it. He has to be aware, under a whole line of cases, including from this Court, Delgado, Medina, and a lot of other cases I've cited, he has to be aware that the substantive offense is going to be committed, and he has to perform some affirmative act which furthers the commission of that crime. And the fact that he might be guilty of other crimes, even related crimes, has nothing to do with your analysis. But you're saying even if this had been charged as a Pinkerton liability and instructed as such, that that still wouldn't, it still couldn't stand? I'm not going to pass on that question because Pinkerton liability was not charged, and there's precedent from this Court saying in that case the panel cannot consider that. Right. So your point is that at least the way this was charged, the conspiracy has nothing to do with it. You have to prove it, the conduct specific to this case. Exactly. Under well-settled, accomplished liability cases. The evidence at trial was that they were partners, that they sold together, they used the same source of heroin, they bagged at the same location. Your client had previously sold to Ms. Weibold, right? And so I guess it seems to me that much of the evidence that comes in to prove the conspiracy, it's also relevant to show that your client made affirmative acts that furthered this particular sale. I respectfully disagree with the list that you just provided. Okay. Explain. My client did not work with the co-defendant. The only thing they shared was a common cell phone number, and they targeted some of the same clients, but they had different customer lists, and this is proven by the government's own evidence. It's the phone records that they put into evidence, the extraction records, which I ruined my eyes looking at, and they also put in four cell phones, two of which were discovered at one of Mr. Weiss's residence and two were discovered at my client's residence, and they all had drug-related messages on it, but they weren't the same. And on days that those phone records overlapped, there were different messages on each person's phone. So there's no way that one defendant was privy to the solicitation or response to another's sales. Why did they share a phone number? I don't know why, because it was easier. They were working together. No. Well, I don't think they were working together. They always showed up alone. They were never seen selling together. They used their own private vehicles for the sale, and they didn't share profits. It was a matter of complete indifference to each client as to what to each defendant as to whether the other one made money or not. It's almost as if they had a non-compete agreement. Well, I thought the testimony was that they shared vehicles. They didn't share vehicles, Your Honor. In one instance, in 20 months, one instance there was that was post-dated, the sale to Ms. Weibold, where Codefendant Weiss used my client's car to make a sale. I don't know what the reason was. It's not explained. But every other sale, Mr. Weiss used his white Jeep, and my client either used the Infiniti or a Lexus, and they didn't share. Ms. Weibold testifies that she would call both Weiss and Allen, and they shared the same phone number. And at the first transaction, which was with Mr. Allen, there was a reference to Weiss having already vouched for her. That all would support an inference that they are working together. I'm not saying that my client was never shown to have sold to Ms. Weibold. I'm talking about this particular sale that he is serving 30 years on. So let me ask about that because it seemed like you pivoted to your challenge to the conspiracy charge, and a lot of what you just said was part of that challenge. Let's pretend for a minute that we're not persuaded by that, that we believe that the jury found that there were the elements of conspiracy and that the evidence can support it. Can you go back to the question of if that's true, how does that bear on accessory liability under these charges and instructions on the bottle-injured one? The government had to prove the two elements of the convict's liability for that particular sale to Ms. Weibold. And what's the case that we should look at to sort of remind us that it's a different analysis from Pinkerton? There are many. There's Delgado and Medina, for example. I think Pippola, Labatt. There's a whole list of cases in my reply brief that I cited as well. I don't have the page. And are those cases where there is a conspiracy, but nevertheless this standard applies, or are those cases that tell us generically the standard for accessory liability? Let me talk about Delgado. The defendant, Anastasio, his brother was shot by a rival gang member. And in retaliation, Anastasio's gang decided to seek revenge against the other gang. And Anastasio was present when they discussed going out on a raid to target the other gang, though he didn't participate in formulating a plan. He was just there. He went to the trouble of trying to find a gun, but it was a terrible gun that was broken. And then a senior gang leader took the gun from him. He went off to find another gun, so he was not there when the two victims were murdered. And the gun that he gave to the gang leader, the gang leader tried to fire it, but since it was broken it never fired. So nothing Anastasio did furthered the two murders. He was convicted of RICO conspiracy, but he was the – this court found that the evidence was insufficient to support his conviction for substantive murder against either of the people who died. And I think that's a perfect example of the principle that I'm talking about. Though in that case, there was abundant evidence that Anastasio intended to seek revenge and try to murder people, but he didn't do anything. What's the response to the argument that the distinction here is, regardless of whether there was a conspiracy, that there's evidence of things, if we believe that there was a conspiracy, the things that your client did in connection with that, let's say making, sharing, essentially sharing a phone number for the purpose of sharing access to customers, is that enough to get you over, get you past Delgado? Because there's some act that moved the needle forward relative to this particular sale. I don't think so, Your Honor, because the only thing – it's really like a non-compete agreement. I agree with the prosecutor that on Tuesday and Thursday I'm going to say – Yeah, let's pretend we don't believe that, okay, for a second, that that's not going to persuade us. Is it enough – let's pretend that we – I am not persuaded that there wasn't cooperation between these two in a general sense. I'm trying to understand where the line is when folks have a general cooperation for dealing – when you have to instruct as a Pinkerton case versus when you can get to hitting and abetting without. Well, you still have to show that there was some affirmative conduct by the alleged accomplice that furthered that substantive crime. And there – no matter what other crimes he and the other fellow may have committed, this particular crime he has to aid. And the only evidence that the government proffered in this case on that point was, A, that they shared the same cell phone, which, as I've discussed and is all over my brief, there's no proof of that. They shared the same number, not the same phone. And then the other thing the government has alleged is that they used my client's apartment as a joint stash house where they packaged drugs together. There's no evidence of that either. In the 20 months of the conspiracy that was charged, there were three days in July 2018 when the co-defendant's car was seen outside my client's apartment. And the co-defendant was seen outside the apartment. Three days in 20 months. That also – there's no evidence of what happened in the apartment. They also had GPS on both their vehicles for two months thereafter. No evidence that they were ever – that Mr. Weiss ever went to my client's apartment again. Furthermore, the sale to Ms. Weibel was nine months prior to the police observing Mr. Weiss at my client's apartment. And there's no evidence that they were jointly packaging at that point, nine months earlier. In fact, there was no evidence that my client even lived at JFK Boulevard at that point. So those are the two things that the government has relied on. A claim that's entirely conjectural, that they shared my client's apartment to package drugs, and therefore maybe the drugs that Mr. Weiss sold to Ms. Weibel on that day were packaged by my client. Maybe. But there's no evidence to support that that was a joint stash house, and certainly not at the time of the sale. And they also rely on the fact that there was the same cell phone passed between them. But they didn't argue that at trial. They argued that on appeal. At trial, consistent with my argument and consistent with their own evidence, they argued that they shared a number. And so one person would solicit customers on this or that day, and the other one would solicit customers on other days. And the phone evidence shows that they were not privy to the messages that each other sent. So there was no way that my client could have, by happenstance, known that on October 27, 2017. This is going to show my technological limitations. If they share a number, then don't they both have access to the voicemail associated with that number? Your Honor, I actually tried to Google this, because if you think you're weak on technology, I'm clearly much weaker. And I did find that there was some way that you could have two separate phones using the same number. Maybe they had different SIM cards. I don't know. I don't know. Okay, but we're way beyond the record.  Right. But as a matter of fact, the evidence showed that they did not use the same phone, and they weren't privy to each other's messages. Let's pretend they did use the same phone, right? I mean, again, this is sort of the tension between fighting the conspiracy charge and the argument of the aiding and abetting. Let's conclude that the jury could conclude that they either shared a phone or they shared a phone number in a way that created sort of a joint operation. Would that be enough vis-a-vis the aiding and abetting charge on this day, or would you have to show that vis-a-vis this particular sale, your client had in a minimum knowledge that the sale was happening or some participation in the act? Well, the case law, including from this Court and Rosamond from the Supreme Court, says that both those things have to be proven by the government in order to have the defendant was aware of the crime and that he did something affirmative to aid its commission. And they didn't show he was aware of it, and they didn't show he did anything for that particular sale. It was a matter of complete happenstance that the codefendant sold drugs to Ms. Weibold on that day, and no evidence that my client had a clue that was going on, and certainly no evidence that he did anything with respect to that particular sale. All right. Well, you've reserved a minute for rebuttal, and now we'll hear from Mr. Ryan. Good morning, Your Honors. May it please the Court, my name is Gilbert Ryan, and I'm an Assistant United States Attorney in the Eastern District of New York, and I represented the government in the District Court in this case. In this case, the evidence was sufficient to show that Defendant Allen aided and abetted the sale of heroin to Sarah Weibold, which caused her serious bodily injury, and there's many different reasons why, many different affirmative acts that he took to further this particular crime. As was discussed already, he entered into this joint partnership with Defendant Weisch to sell drugs, and this was testified to by Sarah Weibold. She testified that she would buy from both defendants, she had done it dozens of times beginning in the summer of 2017 through her overdose, and that each time she contacted the shared cell phone that they used as part of their business. So I have a question about that. So that's a piece of evidence that supports the conspiracy charge. I'm trying to understand whether the existence of a joint partnership to distribute drugs is enough in the absence of a Pinkerton instruction to move the needle forward on a particular case like this. Well, in this case, the facts are not only that they just had a joint partnership, but that the Defendant Allen actually conducted sales in furtherance of this partnership. So this is not a situation where they just had a conspiracy, which is just the agreement. Allen actually did things. And so, again, I think that would be helpful to the conspiracy, but I'm trying to understand. So your view is that because Allen conducted sales pursuant to the conspiracy, Allen is liable for this sale, which we all know was conducted by Weich? It's because it was done in furtherance of their joint partnership. As part of this – as part of his participation, he – Isn't that Pinkerton? Isn't – aren't we – isn't that – am I misunderstanding the distinction between Pinkerton and regular aiding and abetting? Pinkerton is obviously a theory whereby co-conspirators can be liable for the acts of other co-conspirators. Okay. Here the difference, though, is that under an aiding and abetting theory, the Defendant who's convicted under that theory must have taken an affirmative act. And here he did do that. What did he do to aid and abet with respect to this transaction? I mean, the suggestion is the Government has to provide evidence of his involvement, of Allen's involvement with respect to this particular sale. Correct. And so what he – what he did is he sold on other opportunities and thereby cultivated this business relationship with Sarah Wiebold. Sarah Wiebold was their customer. It wasn't – she wasn't just Weich's customer. She was the customer of both Defendants. She testified that they – that their operation was different than other drug dealers who she might buy from, that they were very professional. They weren't users themselves. So what I'm hearing is that there isn't any specific evidence of any involvement on his part that day, but for these other reasons, including that she was their customer, that that's sufficient. Well, there's additional reasons – additional things he did as well. And so there's this – there's been this discussion of the cell phone. He obviously agreed to either share the cell phone number. Was the cell phone used on October 27, 2017? The cell phone was. Now, the record of trial shows that there were many different, you know, phone numbers that were ultimately used. But during this period, there was a particular cell phone number that was used. The number was actually saved in Sarah Wiebold's phone under the name James, which was Defendant Allen's alias. The phone was then used – the evidence showed a trial through cell site data to conduct a sale that was observed by law enforcement that Allen did about a week later, which shows that this phone was being used by both Weich and Allen to conduct these sales. So the affirmative act is setting up a joint cell phone that serviced customers. And the purpose of doing this was to, as Your Honor is saying, is to service customers. It was done for the purpose of achieving the objectives of their business, which are sales to individual drug users. And in addition to that – Was the evidence sharing the number or actually sharing a phone? So the evidence supports that they shared a phone. There were many different phones that were recovered in this case that were used as part of the conspiracy. But I submit, Your Honor, it doesn't really matter if it was a shared phone or a shared – or just a shared number. The fact is they shared – they used the number, and it was done – they agreed to do that, and it was done for the purpose of their drug distribution operation. In addition to that, the phone records at trial show that this number was used and actually contacted by Sarah Wiebold going far back into the summer of 2017. And she testified that she had bought from the defense dozens of times between the summer and her overdose. And so the jury could properly infer at this stage, they could rationally infer that the defense would have had to have exchanged the phones so that they could continue on with their operation. In addition to that, there was evidence at trial that they did both use this location in Somerset, New Jersey, where Defendant Allen was actually arrested. Now, the evidence at trial involved observations of the defense there together in the summer of 2018. However – and the evidence also showed that at that location there were – there was drug paraphernalia, and there was – there eventually were some drugs found in a car there. There was money found there, black rubber bands, which are what the defendants used to package their drugs. So it certainly supported they were both using that location to package their drugs. And there was a note found there which had the names of customers on it, which actually we know from evidence at trial predated Sarah Wiebold's overdose. And so the evidence is consistent with the defendants having used that location together for their operation way prior to Sarah Wiebold's overdose. In addition to that, Sarah Wiebold testified at trial that there were times where she tried to buy from the defendants, and they had told her that, oh, they've already gone back to New Jersey for the day, and they wouldn't be available to sell to her. So it's really all this evidence coming together. It's a totality of the circumstances, all of these factors that I'm talking about, which demonstrate that Allen took affirmative acts in – which supported this sale. You know, under the theory that's being posited by the defendant, Allen would just escape liability, even though he is working with Defendant Weiss, just because he's not the one who physically handed the drugs to Sarah Wiebold. But that's not what's required by the law. The law doesn't require that. It just requires that there be some affirmative act that was taken. And the evidence clearly shows several affirmative acts that were taken to do that. And so, you know, for all these reasons, the defendant Allen's appeal should be denied. I do want to say there was something said about having to know all the particular details of a particular crime, about a particular sale. This Court's precedent is clear in a case called Reifler, that it's not required that a defendant who aids in a vets a crime know every particular detail about the crime. They have to obviously know that the crime is going to occur, but they don't have to necessarily know where or when it's going to occur. And here, given the evidence at trial and the relationship between these defendants and what they were doing, Allen clearly knew that Weiss was going to be selling drugs to their shared customers. I want to turn now to some arguments that Defendant Weiss raised. First, with regard to the argument about sentencing, I think as Your Honors pointed out, there is no requirement that a departure that wasn't applicable had been considered at sentencing. This issue was never even raised in the district court. And frankly, it's difficult to follow this issue. I think the Court is exactly right that I want to suggest that it doesn't have to be considered. And with regard to Defendant Weiss's challenge to the substantive reasonableness of his sentence, this sentence was within the guidelines for Defendant Weiss. His guidelines were 360 to life, and this was a 40-year sentence, which would clearly be within the guidelines. And under a substantive reasonable analysis, the question that this Court must ask itself is, does the sentence shock the conscience? And in this case, the district court was very clear about the many factors it considered, not only the fact that Defendant Weiss's conduct had led to the death of a person and the near death of somebody. There also were other overdoses which were discussed at trial as well. And the Court was very clear that the Court was considering the defendant's prior drug convictions and also his prior conviction for the use of a firearm, which is a tool of a drug trade. And so that's the reason why a 40-year sentence was imposed. The Court was clear that it considered mitigating factors but just didn't find them to be persuasive and so imposed the sentence. There was some discussion, although I believe counsel said that maybe there is not a challenge to the Rule 29 decision about the but-for causation of Vincent Price's death, which is attributed to Weiss. There was some comment about that. But I submit that the evidence was very clear that the government met its burden, both under the decision in Barrage and also under this Court's decision in Seca, that the government had shown that the defendant's sale of fentanyl to Vincent Price was a but-for cause of his death. And the evidence was very clear. There was testimony from a government expert who testified that Vincent Price had basically given himself a terminal shot of fentanyl, and under the context of his death, that is what caused his death. So there's abundant evidence of that as well. So I see I do have some additional time left, unless Your Honors have initial questions. I can help. Sure. And I'm not suggesting that there's reversible error here, but I'm just curious your view. There's some – it was interesting to read the transcript. The district judge had a particular preference as to how cross-examination questions would be phrased. And I'm just wondering whether, in your view, as a general matter, and I know there can be specific questions that are objectionable because they go way beyond the record or they're inflammatory, but as a general matter, is there anything objectionable under the rules of evidence on cross-examination to making a statement and asking the witness to confirm whether it's correct? That's obviously a very common thing. It's done quite frequently. However, district court judges do have a lot of leeway in terms of making sure that questions are not misleading. And how would an is-that-correct question be misleading? It's not necessarily would be misleading. What I will say about – Well, you didn't object to these questions. The government did not object. Obviously, these were sous-spente objections by the district court. I will say on this issue, though, the record's very clear that there are many times, if not most often, where an attorney might ask a question and it ended in correct or it ended in is-that-right. It was a cause of concern for the district court. But the attorney was very quickly able to ask the same exact question. Well, that goes to whether it's harmless and whether it had any impact at all. Yes. But it was a curious series of rulings to say that a defense lawyer on cross-examination of a government witness can't make affirmative statements and say is-that-correct. Your Honor, that is a common practice in the district court for questions to be asked in such a way. I think, as Your Honor said, Your Honor is exactly right. The question here is was it an abuse of discretion or, you know, at the end, was it harmless error. Here, any error, if there was one, was certainly harmless because defense counsel was able to ask the same exact questions almost, you know, just using a slight turn of phrase and get the same response. I mean, I'll point out and we pointed this in our brief. There was one exchange where a lawyer asked, and Vincent Price, he overdosed at the intersection of Smyrna Avenue and Shotwell Avenue. Is that right? The court didn't like the way that was asked and the lawyer just asked, did Vincent Price overdose at the intersection of Smyrna Avenue and Shotwell Avenue? It's the same exact question. That question was allowed. And so there really was no harm here at all. Counsel was able to ask the questions that they were trying to ask. And not only that, they were able to build up enough in the record to then, at summation, make arguments to try to impeach the memory of one of the government's chief witnesses, who was Detective Vaccarino. I mean, one of the arguments made is that the judge made the jury think that counsel was sort of clueless. And I think that it's clear from the record that that wasn't the case because the court, both at the beginning of the trial and the court's preliminary instructions and at the end, made it very clear that anything that the court said, any comments that the court said were not evidence and they should not be construed as believing that the court had any view whatsoever about the merits of the case. And the court emphasized that it did not. And I will say that the court also took issue with the way the government asked questions as well. There were many times. But you're not allowed to ask leading questions. Well, that's correct. But even the non-leading questions that were asked, there was cross-examination of defense witnesses in this case, so there was cross-examination by the government. But there were times where the government would ask questions on direct and the court would interject because the court didn't like the way a question was asked. Particularly, I'll note during the testimony of Detective Napolitano and Detective Libretti, there were times when the government tried to refresh recollection of witnesses and the court did not like the way the government was doing it and would insert its own question before allowing the government to proceed. And so this certainly was happening on both sides. It wasn't like it was something that was only reserved for one party to the case. And so there certainly wasn't any prejudice. And in any event, as I said, as Your Honors pointed out, under a harmless error analysis, it's the government's position that there was no error. I see now that I've exceeded my time. Unless there's additional questions from the panel, it's the government's request that the appeal be denied and that judgments below be affirmed. Thank you, Mr. Ryan. Mr. Hirons, we'll hear from you for a minute, everybody. Thank you. Just to clarify on the Rule 29 motion, we didn't directly appeal it here, but the issue raised in it is about this flood port causation and the facts in the record are the two experts testified that their opinion was that they couldn't say if the fentanyl attributed to Mr. White. You're making that argument with respect to sufficiency of the evidence. I get that. But to the district court, there was a conviction. The judge had not overturned the conviction. And so one of the elements of the offense is that it was a flood port cause, right? You're saying the judge should have considered whether or not the proof was insufficient to establish the crime of conviction at the time she was imposing sentence for that crime? Here's why I think it matters. Here's why I think that matters, because it's specifically contemplating the intent and the mystery of this flood port causation. I think if it had been, I mean, as Your Honor put earlier, like I think some of the rub here is with the weight that it was given. I think that if it was given different weight and it had been analyzed more circumspectly and comprehensively, I think it wouldn't have resulted in a 40-year sentence or a 30-year sentence. These sentences are huge, and I think that they are unreasonable. And there are reasons why probation was recommending a 25-year sentence, and there are reasons why the guidelines suggest 360 to life. I understand those things, but this sentence, 480 months for this conduct, I presented a roadmap that it seems you've been listening to, and I hope that it's enough for the court to consider some relief for my client. Thank you. Thank you. Ms. Van Ness, we'll hear you for a minute of rebuttal. The prosecutor has said that there were the hallmark of drug packaging, paraphernalia was found in my client's apartment, that was rudimentary packaging material that their own detective said was common for heroin being sold in small amounts in bundles. But why isn't setting up a joint phone number that will service the clients of these two men enough to be an affirmative act for purposes of aiding and abetting? It seems to me that that alone should do it. Because that act occurred, I don't know when, 20 months earlier? Okay. So if 20 months earlier I say you can use my apartment anytime to sell drugs and then you sell drugs in that apartment, that would not be enough for me to be charged and convicted as an aider and abetter when I made the location available to you? Well, no. Not unless the buyer went to that apartment and the co-defendant sold drugs. Right. That's what I'm assuming. So 20 months earlier I say you can use my apartment, and that's the location where the overdose takes place and the sale takes place. That would be enough, you would agree? I'm taking the fifth on that, Your Honor. But I do want to say each. So why is it any different then to say you can use my phone, we will use this joint phone together to service clients? Why isn't that the same thing? There was not a joint phone. It was a joint phone number. The government's exhibits show that. So what's the difference? We will use a joint phone. The difference is that it was. So he's going to use his phone over there, I'm going to use my phone over here, but it rings, and so who's ever at the phone can pick up and facilitate drug deals. No, you send out a text message to a bunch of people, and people respond to you, not to Judge Chin. And so you're the only one that's privy to the response, and you're the only one that engaged in that sale. They're sharing a customer, the same customer, same technique, sending a text in the morning. There's so many common things. That might be relevant to the conspiracy charge, though I've argued that it is not. But for purposes of count four, it has nothing to do with anything, because my client was not aware that that sale was occurring that day. The prosecutor has said that on occasion, Weibold said, you know, that these men were not available because they went back to New Jersey. Well, Mr. Weiss had two homes, one in Staten Island and one in New Jersey, in New Union, New Jersey. And lo and behold, the government never searched the house in Union, New Jersey. So that was a perfect premises for Codefendant Weiss to package his own drugs with these glassine and rubber bands. There is no evidence that my client packaged for him, none, and certainly not for that sale. The government also mentioned the fact that the two men were listed under James in Weibold's phone. I don't know how many times I have to say this, that she testified that she didn't want to put James slash Marco as the contact in her phone, because that would look suspicious. Her parents knew that she was an addict. She didn't want to put drug dealer in her phone. So she picked arbitrarily one client's name, one defendant's name, and put that as the contact she would use for both. But that doesn't mean that the other person was privy to the messages she sent when the other person was not involved in sending out that e-mail blast. The Pinkerton charge, again, if two sellers conspire together, they're selling in the same neighborhood, and they sell on different days. If we didn't need Pinkerton, then each defendant would be automatically liable for every sale the other one committed. And that's simply not wrong. That's why you need a Pinkerton charge, to establish liability for co-conspirators for other conspirators' sales. So the fact that they shared a customer list, which was not coextensive, by the way. The phones recovered show that they had different people on their list, some of the same, some different. And, in fact, Weibold was only listed as contact on co-defendant Weiss' phone. She was not a contact on my client's phone. So for all these reasons, including those set forth in points three and four, which you talked about the cross-examination question, I don't have time to discuss those points, but I rest on my brief for those. All right. Thank you very much. Thank you all. We will reserve decision.